Filed 7/18/22  In re R.H. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re R.H., a Person Coming Under the Juvenile Court Law. | |
| | D080345 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, et al., | |
| | (Super. Ct. No. J520945) |
| Respondents, | |
| v. | |
| R.H., a Minor, etc., | |
| Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Browder A. Willis III, Judge.  Reversed in part and remanded.

Tracy M. De Soto, under appointment by the Court of Appeal, for Minor and Appellant.

Marissa Coffey, under appointment by the Court of Appeal, for Respondent S.M.

Terence M. Chucas for Respondent B.H.

Lonnie J. Eldridge, County Counsel, Claudia G. Silva, Acting County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Respondent San Diego County Health and Human Services Agency.

## INTRODUCTION

B.H. (Father) told his 4-year-old daughter's nanny that the child's mother and her boyfriend were living in his walls, and he pointed a gun at the wall but restrained himself from shooting. When the police responded, Father told them the child's mother had broken into the house and replaced his daughter with a " 'look alike.' " During this delusion, Father struck the child in the face. The police placed Father on a 72-hour psychiatric hold and took the child into protective custody. The juvenile court found a clear pattern of Father suffering similar psychotic episodes, "going . . . as far back as 2017," the child was physically abused during such an episode, and that concerns of Father's mental health were "certainly" sufficient to lead the court to believe it "plays into the current risk . . . that could lead to future harm [to R.H.] that requires monitoring by th[e] court."

Yet after making these findings, the court dismissed count 2 of the petition, which alleged the child came within the jurisdiction of the juvenile court because she has suffered, or there is a substantial risk she will suffer, serious physical harm due to Father's inability to provide regular care for the child because of his mental illness, pursuant to Welfare and Institutions Code[1] section 300, subdivision (b)(1). The court found "by clear and convincing evidence" that R.H. was physically abused, as alleged in count 1

---

[1]     All further unspecified statutory references are to the Welfare and Institutions Code.

2

pursuant to section 300, subdivision (a), and took jurisdiction on that count only. It then admittedly went "out on a limb" and returned R.H. to Father's care and ordered him to later submit to an independent psychological evaluation, among other conditions.

On appeal, R.H. contends the juvenile court erred by dismissing count 2 and returning her to Father's care. The San Diego Health and Human Services Agency (Agency) and R.H.'s mother, S.M. (Mother), join in R.H.'s appeal.

We conclude the court erred by dismissing count 2, on two independent grounds: First, the court erroneously required proof of the jurisdictional findings by clear and convincing evidence, rather than by a preponderance of the evidence. Second, even if we were to assume the court applied the correct burden of proof when it dismissed count 2, we conclude the court's own factual findings compelled it to find R.H. came within its jurisdiction under section 300, subdivision (b)(1), as a matter of law. We acknowledge the court did take jurisdiction over R.H. pursuant to section 300, subdivision (a). Still, the court's refusal to *also* find jurisdiction under section 300, subdivision (b)(1), was a critical error. The uncontroverted evidence established that Father's mental illness is the true protective issue that required dependency jurisdiction to monitor for R.H.'s safety. We will reverse the court's jurisdictional order and remand with instructions for it to reinstate count 2 and to enter a new order finding jurisdiction pursuant to both section 300, subdivision (a) and subdivision (b)(1).

We are, however, constrained by the statutory presumption against removal, under section 361, subdivision (c), and the governing deferential standard of review. Consequently, we affirm the court's dispositional order placing R.H. with Father. But, on remand, the court should consider whether

3

the measures it put in place remain adequate to protect R.H. in light of its erroneous dismissal of count 2, and any additional information obtained during the pendency of this appeal.

FACTUAL AND PROCEDURAL HISTORY

I.

*The Events Underlying the Dependency Petition*[2]

In January 2022, Angel had been R.H.'s nanny for about a month and a half. R.H., who was four years old, lived alone with Father; they had not lived in San Diego for long. On Monday, January 10, Angel noticed that Father was behaving strangely. That day, Angel went to pick up R.H. and Father at a park. Father would not let Angel get out of the car. He looked around until "it was safe for him to talk" and then told Angel "he didn't want them to hear him." By "them," Father meant R.H.'s mother, her boyfriend, and the grandmother. He told Angel the grandmother was "in town" and "that [wa]s how the mother and her boyfriend knew where they were." (Mother was living in Oregon at the time.)

Angel had seen Father talk of Mother and her boyfriend living "in the walls." One time, Father "was yelling in his room telling them to get out." He "made [Angel] sit in the room listening to them talk in the walls." He had also accused Angel of "working for" Mother. Father "constantly" told Angel

---

[2]     We derive the facts from the Agency's investigation and interviews of witnesses set forth in the Agency's reports, which were admitted into evidence without objection at the contested jurisdiction and disposition hearing in April 2022. These included the detention report filed January 18, 2022, the jurisdiction and disposition report filed February 8, 2022, various addenda reports, and their attachments. We do not consider the attachments to the addendum report filed April 18, 2022 (" 'Additional Information:  Police Reports from Oregon' "), which the court excluded based on Father's objection at the hearing.

that R.H. had also seen Mother, and that R.H. "yelled at her." He told Angel "to go ask [R.H.]" and, when she did, R.H. initially told Angel she had not seen Mother. Angel later asked the child again and this time, R.H. said she had seen Mother "in the closet."

R.H. never told Angel she was scared of Father, but "it was obvious" to Angel the child was scared. Sometimes R.H. would "drop and roll up in[to] a ball" when Father appeared. She was "terrified" to be left alone in a room, and would "scream" when that occurred. Angel had not seen Father hit R.H. but had seen him "yank [R.H.] around," that is, "grab her by the arm and pull her," and she had seen bruises on R.H.'s arm. Angel believed Father was using methamphetamines. Her own father had abused methamphetamines, and she knew "how people act and what their habits are" when they were abusing methamphetamines. Angel had also seen Father smoke marijuana in front of R.H.

Angel last saw R.H. on Tuesday, January 11, 2022, wearing a pink dress. On Thursday, January 13, Father called Angel "freaking out." He, again, told Angel that Mother and her boyfriend were living in his walls. Father said he aimed his gun and the "infra-red light" at the wall, "but restrained himself from shooting at the wall." He told Angel "the judge would be proud of him for showing such restraint." That worried Angel because, she thought, "what if [R.H.] were to get shot."[3] So Angel asked Father how R.H. was doing. Father responded by sending Angel "a random selfie" of himself and R.H. The selfie showed R.H. wearing the same pink dress Angel had left her in on Tuesday.

---

[3]    Angel had not seen Father with any guns and did not know if he owned any. Mother told the Agency that Father does own guns in Oregon, but she does not know if he had any guns in San Diego.

On January 13, 2022, at approximately 3:20 a.m., San Diego Police Officers Roy and Oberndorfer responded to Father's home to investigate a report of domestic violence. When Father opened the door, the officers saw the home "in disarray." "[B]elongings [had been] thrown throughout the living room" and the patio door had been left open. R.H. "was running throughout the home" in "an unkempt appearance."

R.H. told Officer Roy that one of Father's friends had come over, but she did not say who. The child told the officer "she had felt very afraid and was crying, so her dad struck her across the face." R.H. denied "previous physical abuse" and the officers noted "[t]here were no visible injuries" on her.

Father told the officers "he believed that his daughter's mother had broken into his home and was hiding upstairs." "[T]his woman took his daughter . . . and replaced her with a 'look alike.'" He had heard "a large explosion and people screaming" around 11:00 p.m. the night before. He "believed that his daughter was one of the people screaming for help, but said that he was lying next to [R.H.] at the time of the . . . explosion which is why he believed [she] was not his real daughter." Father told the officers he struck R.H. in the face because "she was being too loud," but "he knew it wasn't his daughter because 'she doesn't cry like that.'" The officers noted Father "could not maintain an accurate story line throughout his statement" and they "redirected [him] numerous times." Father even "accused Officer Roy approximately three times of being involved with the people who replaced his daughter."

The officers determined that, "due to [Father's] delusions which ultimately led him to slap [R.H.] in the face," they needed to place Father on

6

a 5150 hold.[4] So he was taken to the hospital for further evaluation and treatment. Because the officers were unable to locate family members who could take custody of R.H., she was taken to Rady's Children's Hospital and then to Polinsky Children's Center.

An Agency social worker, Vanessa Chavez, spoke with R.H. at Polinsky Children's Center on January 13, 2022. Chavez did not see any marks or bruises on the child. R.H. said the police came to her home and that her father was in the hospital, but did not respond when Chavez asked her why or what happened. R.H. told Chavez, " 'My dad hit my cheek,' " and that it hurt a lot. She told Chavez she was scared and that "her dad scares her a lot." She did not answer, though, when Chavez asked her what Father does to scare her. As Chavez was leaving, R.H. began to cry and said that she wanted to go home to her " 'owner.' " When Chavez asked who that was, R.H. did not answer, but stomped her foot and said, again, " 'I want to go home to my owner.' " Chavez asked again who that was but R.H. continued screaming, " 'my owner.' "

Chavez spoke with Mother. Mother said that she had left Father in 2019, and he has "full custody" of R.H. Mother, who was living in Oregon, had not spoken to Father and was not aware of the recent incident. When Chavez reviewed the allegations with her, Mother said, "this has happened before" and explained that Father "stomped on her face and she went to the hospital." Mother was referring to a domestic violence incident that occurred

---

4    Section 5150 authorizes certain designated personnel to take a person who is a danger to himself or to others "as a result of a mental health disorder" into custody for "up to 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment in a facility designated by the county." (§ 5150, subd. (a).)

between her and Father in San Diego when R.H. was two years old. Chavez obtained the police report regarding this incident, which revealed the following facts:

On May 2, 2019, Mother called the police "screaming" for help but the call was disconnected. When officers arrived at the home shortly after midnight, they found Father shirtless and "covered in blood." He "appeared very agitated, had his eyes wide open, and was rambling incoherently stating that people were out to get him." He had a scratch mark on his right shoulder and the left side of his face. At first, Father told the officers Mother walked away and came back "a different person" and "he believed she was an impersonator." So he " 'detained' " Mother by holding her down to the ground by her hands and "put his knee on her chin, telling her she could not leave."

After he was advised of his *Miranda*[5] rights, Father told the officers that his private investigator in Oregon had told him "there are two women that are twins who are posing as [his] girlfriend." He told Mother not to leave the room and asked her if she was "a pedophile." Mother "then came at [him] and started to kick and scratch [him]." He looked down and "saw her nose was bleeding from [him] holding her down."

The officers found Mother with a bloody nose and a cut under her left eye. She told the police that she asked Father to give her R.H., who was crying, and Father said, " 'No, I'm scared of you two.' " At some point, "everything started escalating." Father scared Mother so she tried to call 911 but he "ripped" the phone from her hands and she fell to the floor. He then "squeeze[d her] neck" with one hand and "strangled" her. She started to kick and scratch at him to stop him. Father stopped because he saw R.H. But as

---

5    *Miranda v. Arizona* (1966) 384 U.S. 436.

he was getting off Mother, Father kicked her on the left side of her face with his foot. While speaking to the officers, Mother coughed up blood and complained of being dizzy and nauseated. Paramedics took her, along with R.H., to the emergency room due to her injuries but she later refused medical treatment and was discharged. The officers obtained an emergency protective order against Father for Mother and R.H. Father was arrested, although no charges were ever filed.

Mother told Chavez that Father had always thought she was living in the walls. She provided Chavez with screenshots of numerous text messages from Father "stating that she is living in his walls."[6] In one series of text messages to Mother, Father said: "You had better get here NOW! [¶] Not joking or I will go right through the WALL. [¶] I promise you that! [¶] The door is unlocked. Or you can just go t[h]rough the wall like normal." In another series, he texted: "Am I still waiting! [¶] Say something. [¶] I hear ya. Now get the FUCK in here!" In another exchange, Mother sent Father a picture of herself and wrote, "I'm home in my bed." Father responded: "GOD DAMN Lies! Get your ass in HERE!" In another series, Father texted: "Get your ass over here or I go through the wall after [R.H.] wakes up. [¶] I will get my pickmatic[7] out of the garage. [¶] I don't have much time before she wakes up. [¶] Just giving you an opportunity. [¶] Fucken FUCK yourself if

---

[6] The screenshots were attached to the Agency's jurisdiction and disposition report filed February 8, 2022, which, as we have noted, was admitted into evidence without objection at the contested jurisdiction and disposition hearing. The text messages are not dated, and it is not readily apparent whether they are from a single day or whether they are in the order in which they were sent and/or received. We quote the relevant text messages in the order they appear in the attachment.

[7] A pickmatic is a garden tool with a pickaxe, or similar tool, on one end.

you really did FUCKEN FUCK on my couch in MY condo. [¶] I promise you it WILL be a death sentence. [¶] If I don't get some sort of real reply . . ."

II.

*Prior Dependency History in Oregon*

The Agency determined the family had a child welfare services history in several states, and the parents "have a history of fleeing across state lines (including California, Washington, and Oregon) to avoid Child Welfare Services." The Oregon Department of Human Services (Oregon DHS) had received a number of child welfare referrals regarding R.H. and had filed one dependency petition on R.H.'s behalf.

Relevant here, Oregon DHS received two referrals in late November 2017, when R.H. was approximately nine months old. The first reporter said Father was " 'doing too many drugs,' " was " 'delusional' " and had been "talking about the people he believes are living in his walls in the house." This had "been an ongoing issue for the past six months or so" and the family was now staying in a hotel "because of the people living in the walls." The second reporter stated they "received third party information" that Father was unable to care for "his infant child." Father was "on drugs," "extremely paranoid," "strung out," and "ha[d] weapons." Father believed people lived in his walls, and the family periodically moved out of the home because of his "paranoia of people in the walls." The reporter was concerned because Mother had outstanding warrants and Father would not be able to adequately care for R.H. if Mother were arrested. Oregon DHS closed both referrals as "[u]nfounded" and/or "[u]nable to [l]ocate."

On May 3, 2019, Oregon DHS received a referral of "[n]eglect" and "[t]hreat of [h]arm" to R.H. by Father and "[n]eglect" by Mother, based on the May 2, 2019 incident of domestic violence in San Diego. Oregon DHS

10

determined the allegations were "[f]ounded," and subsequently filed a dependency petition against Father on behalf of R.H.

Based on the case notes from the Oregon dependency case, Father "was diagnosed with 'Paranoid Personality Disorder.' " The diagnosis was characterized as a "brief psychosis th[at] lasts [minutes] to hours as a response to stress, a high need to be in control, and a high need of self-sufficiency and autonomy." It was also documented that Father caused several incidents at the Oregon DHS office that required staff intervention to " 'de-escalate,' " including Father " 'yelling, cursing, shoving open the office doors, commanding attention by a loud scary laugh' " and engaging in " 'unpredictable' " behavior with negative comments toward staff. Once, the agency had to "lock down the office for safety" because of Father's behavior. The case notes also stated that Father "self-reported" he had been under the influence of methamphetamines during the domestic violence incident on May 2, 2019.

This court does not have the full records from the Oregon dependency case, but based on the "Judgment of Dismissal,"[8] the Oregon court took jurisdiction over R.H. based on Father's own admission to the petition, specifically to the allegation that: " 'The father has psychological needs that

---

[8] The Judgment of Dismissal resulted from Father's motion to dismiss dependency jurisdiction, which the Oregon court granted in December 2020, approximately 19 months after it took jurisdiction. At the contested jurisdiction and disposition hearing, at Father's request, the juvenile court took judicial notice of a copy of the Judgment of Dismissal, effective December 1, 2020 from Hood River County Circuit Court of the State of Oregon. Father has requested we take judicial notice of the Judgment of Dismissal. We now grant that unopposed request. (See Evid. Code, § 452, subd. (d).) Our summary of the Oregon dependency case is based, in part, on the Judgment of Dismissal.

may include addiction, domestic violence, and mental health problems, that without assessment and treatment, interfere with his ability to safely parent the child.' "

The Oregon court found nothing in its record that suggested Father had used illegal drugs since May 2019 or that his use of legal drugs, such as marijuana, posed a threat of harm to R.H. The court found the domestic violence incident in May 2019 had occurred, but "[t]here was contradictory information" which suggested "it may have been self-defense, [or] it may have been predicated by a psychotic episode."

The court turned to whether Father had mental health problems that currently affect his ability to safely parent R.H. It noted there was evidence to suggest R.H. "may have been traumatized by the first twenty-six (26) months of her life that she spent being raised by Father," including that R.H. had "frequent night terrors, unusual trouble with diaper changes, unusual behavior in the bath such as being panicky, especially during hair washing, and negative reactions to visits with Father." However, the court noted expert testimony had suggested "it may be impossible to determine" whether R.H.'s trauma was the result of living with Father or being removed from Father, and there was evidence that supported the latter, including "video evidence submitted by Father which shows a little girl apparently excited to see her dad."

The court confirmed "Father has been diagnosed with paranoid personality disorder" but noted the diagnosing doctor had testified his paranoia was "not directed at everybody in the world." Instead, Father's paranoia was directed "more specifically to Mother, her associates, and DHS." The court observed that Father's relationship with DHS was "the worst" it has seen. But it found the relationship "ha[d] not been marred by violence,

12

and generally, it's not been marred by threats," with the exception of a text message Father sent to Mother "which referenced his murdering [a caseworker]" that was then forwarded to the same caseworker. The court accepted as "plausible" Father's explanation that his use of "the word 'murdering' was metaphorical."[9]

The Oregon court acknowledged "Father has had occasional psychotic episodes in his life," including an episode in December 2017 when Father believed there were people in the walls and another where Father ripped open a mattress to see "what was vibrating inside." But it found "[t]he psychotic episodes appear to be highly infrequent," as Father had not had an episode in the past 19 months since he assaulted Mother in May 2019. The court noted Father had engaged in therapy throughout the case, and that his therapist reported Father had become "better at decreasing his reactivity" and "more circumspect in his engagement with Mother."

Notably, the court found "Father's paranoid personality disorder is apparent in Father's emotional regulation" and "Father's [in]ability to regulate his emotions could have a negative impact on [R.H.] and is an issue that remains." But, although Father posed some risk of harm to R.H., the court concluded on the facts before it that it was not so serious in its " 'type, degree, and duration' " as to require Oregon to continue jurisdiction.

_____

9　　During the Agency's investigation, Chavez interviewed Father's cousin's wife, B.S., who had placement of R.H. during the Oregon dependency case. B.S. told Chavez that Father threatened to have the caseworker killed. The caseworker received a text from Father during a court hearing that said "he was going to have her murder[ed] in her home while she was sleeping" and "the caseworker left the courtroom crying." B.S. also told Chavez that Father had tried to intimidate her as well, and had a history of using methamphetamines and cocaine but she did not know about his current use as they were not in contact.

In July 2021, approximately eight months after the Judgment of Dismissal, Oregon DHS received another referral concerning Father and R.H. The reporter heard R.H. saying, " 'daddy don't hit me like that, daddy it hurts when you hit me like that.' " No injuries to R.H. were reported. Although it concluded the incident did not warrant child welfare involvement, Oregon DHS documented the information "as a concern" because it described "conditions and circumstances that could pose a risk to a child."

## III.

### *The Current Dependency Case in California*

A. *The Petition*

On January 14, 2022, the Agency filed a dependency petition on behalf of R.H., asserting two counts on which the court should take jurisdiction over the child. In count 1, the Agency alleged Father physically abused R.H. on or about January 12, 2022 when he struck her in the face, pursuant to section 300, subdivision (a). It was also alleged Father had been observed "to grab the child by the arms and pull her" and he has been violent with Mother in the presence of the child as recently as May 2019. In count 2, the Agency alleged Father failed to adequately protect or care for R.H. due to his mental illness, pursuant to section 300, subdivision (b)(1).[10]

B. *The Initial Detention Period*

At the detention hearing in January 2022, the juvenile court found the Agency made a prima facie showing on the petition, detained R.H. in out-of-

_____

[10]    As to Mother, the Agency alleged in count 2 that she "has been unable to supervise and protect the child from the father," and that Mother "has a history of substance abuse and has been involved with child welfare services in another state for the child's half-siblings." Mother does not dispute she has an extensive history of methamphetamine abuse. The juvenile court denied Mother's request that R.H. be placed with her, based primarily on her

14

home care, ordered reunification services and liberal supervised visitation for Father, and granted the Agency discretion to lift supervision. Pending the contested jurisdiction and disposition hearing in April 2022, the Agency continued to investigate and offer services to Father.

1. *R.H.'s Additional Disclosures of Father's Physical Abuse*

R.H. made additional statements to several different individuals disclosing that Father hit her. On the way to a visit with Father in early February 2022, R.H. told an Agency intern "she loves her dad" and was excited to see him. She then said, " 'But my dad hits me. He hits me so hard so many times.' " The intern asked R.H. how that made her feel, and she said, " 'Sad but he hugs me after and I love hugs, which makes me feel better.' "

A few days later, R.H. made a similar statement to Chavez on the way to the home of her caregiver, Jennifer. Chavez asked R.H. if Father ever smoked anything and R.H. said that he did. Chavez asked R.H. if Father ever did "funny or weird things" when he smoked. R.H. said yes, but then said, " 'never mind it's a secret.' " R.H. told Chavez she could not tell Chavez because "it was a big secret." When Chavez told R.H. that she could tell her the secret if she wanted to, R.H. said that Father hits her on her face and that made her "scared" and "sad." R.H. then told Chavez, " 'You can't tell my secret.' "

Chavez saw R.H. again in March 2022 at Jennifer's home. Chavez asked R.H. if she remembered what she had said "about her big secret." R.H.

---

history of substance abuse. Mother joins R.H.'s appeal but does not dispute the court's denial of her own request for placement or raise any other additional issues. We discuss the proceedings regarding Mother only where it is relevant to the issues raised by R.H. on appeal.

responded, " 'Which one? That my dad hits me.' " When Chavez said yes and asked R.H. where Father hit her, R.H. "slapped her own cheek" and said it made her " '[v]ery scared and sad.' " Chavez asked R.H. what her other secrets were and R.H. said, "she could not tell."

R.H. also told Jennifer "she has so many secrets that she cannot tell" and asked if Jennifer "would keep her safe." One day, Jennifer was using a neck massager and R.H. asked what it was. Jennifer explained that it was something you could use "to massage yourself where it hurts." R.H. then grabbed the massager and placed it on her cheek. When Jennifer asked why she put it on her cheek, R.H. said that "her dad hits her on her cheek and pinches her."

R.H. also disclosed that Father hit her during an assessment with a CASS[11] clinician. The clinician did not probe further because she "did not want to push" R.H., but R.H. did ask the clinician if she "was going to keep her safe and not hurt her."

Both Jennifer and a prior temporary caregiver reported that R.H. would wake up several times throughout the night screaming, and would also scream and cry if left alone in a room. R.H. did not disclose any reason for her fear or nightmares, but she told Jennifer that a monster comes at 3:00 in the morning. When Chavez asked R.H. why she was having nightmares, R.H. said she has nightmares of "monsters killing her." Chavez did a "safety

---

11    CASS (Comprehensive Assessment and Stabilization Services) is a county program that provides treatment and stabilization services for children in out-of-home placement.

16

house"[12] activity with R.H. in April 2022. R.H. said her and Father would live in the house together. Chavez asked who R.H. did not want in the house and R.H. said that she did not want a monster or " 'EXE.' " Chavez asked what " 'EXE' " was and R.H. did not answer.

2. *Father's Statements to the Agency and Participation in Services*

The Agency was initially unable to reach Father to discuss the allegations and to safety plan for R.H. Chavez first met with Father, accompanied by two attorneys, in late January 2022.

Father denied he hit R.H. He told Chavez that on January 13, 2022 they were trying to go to bed and R.H. "was being extra loud." He said he does not remember hitting R.H., but he was walking towards the front door and R.H. was very close to him, so "he must have hit her when he opened the door." Father said his friend "Laura" was in the home that night. When Chavez asked for Laura's contact information, Father's attorney said he would talk to Laura first and would provide the information to Chavez. It does not appear that Father ever provided the Agency with any information on Laura.

Father denied having any prior mental health diagnosis. Chavez asked Father to sign a release for his records from the hospital following the 5150 psychiatric hold but he declined. Father's attorney said they intended to retrieve the records and would let the Agency know once they had reviewed the records. But the Agency never received any information from Father regarding his hospitalization. The Agency later attempted to schedule a psychological evaluation for Father in late March 2022, but Father's attorney

---

[12] A "safety house" activity is a tool to help children describe, by drawing, what their home and family life needs to look like in order for them to feel safe.

said Father would not participate in a psychological evaluation before the contested jurisdiction hearing.

Father also denied any substance use, but said he did smoke marijuana to help him with his digestion and asthma. The Agency scheduled Father for a hair follicle drug test in February 2022. But his attorney informed the Agency that Father would not submit to a hair follicle drug test.

The Agency referred Father to a child abuse therapist for a psychological evaluation and individual therapy, but after Father had a negative interaction with staff from the therapist's office, Father declined to participate in the child abuse classes. The Agency also provided referrals to a substance abuse specialist and parenting classes. Father participated in a screening call with the substance abuse specialist, but there is no indication he engaged in any services for substance use or abuse. Father did complete all 12 sessions of the parenting class.

3. *Father's Visitation with R.H.*

Father was ordered to have liberal but supervised visitation with R.H. Jennifer, who was Father's friend, agreed to supervise their visits, but soon reported the visits were not going well because Father had difficulty respecting boundaries.

Jennifer agreed to accompany Father on an overnight trip with R.H. to Disneyland for R.H.'s birthday in early March 2022. While there, Father locked himself in his hotel room with R.H. for several hours and would not open the door. Chavez later asked R.H. if she remembered being alone in the hotel room with Father at Disneyland and she shook her head yes. When Chavez asked R.H. what they did in the room, R.H. shrugged her shoulders and did not respond. A second incident occurred a couple of weeks later. Father attended some medical appointments for R.H. with Jennifer. After

the appointments, Father and Jennifer took R.H. to a children's clothing store. R.H. "had a fit" in the store and Father grabbed her by the arm and took her out of the store as she was crying. Later, R.H. told Jennifer that Father had pinched her side and showed her a red mark. Jennifer took a picture of the red mark and sent it to Chavez. Around the same time, the Agency learned that Father attended a field trip at R.H.'s school without permission or supervision.

Jennifer told the Agency that she and Father are "good friends" but she was no longer comfortable supervising his visits. In late March 2022, the Agency informed Father that all visits would need to be supervised by the Agency at the visitation center.

C. *Agency's Conclusion and Recommendations*

In its jurisdiction and disposition report, the Agency concluded that "[F]ather has a history of presenting as paranoid and delusional and becoming violent with his family while in this state. His most recent incident [in January 2022] demonstrate[d] that he is now involving [R.H.] in his delusions and acting violently towards her. Given this, it is unsafe for [R.H.] to be in the father's care until he demonstrates that he has stabilized his mental health. Additionally, [R.H.] has disclosed that the father has hit her more than once and reported being scared and sad when the father hits her. [R.H.] disclosed that when the father hits her, he hits her on the face." In an addendum report, the Agency stated further, that "father has not address[ed] his mental health diagnosis and has not been honest to the Agency about his mental health diagnosis." The Agency was "concerned that if [R.H.] were to return to the parent's care that something more serious may happen." The Agency recommended the juvenile court take jurisdiction, place R.H. in out-of-home care, and provide reunification services to both parents.

19

## IV.

### *Contested Jurisdiction and Disposition Hearing*

The juvenile court held the contested jurisdiction and disposition hearing in April 2022. The Agency moved its reports into evidence (see footnote 2, *ante*) and made Chavez available for cross-examination. Father offered a psychological evaluation report by Dr. Raymond G. Murphy and several pictures of himself and R.H. into evidence and, as previously noted, the Judgment of Dismissal from Oregon for judicial notice. Father and Dr. Murphy testified.

### A. *Chavez's Testimony*

Chavez testified Father had completed parenting classes and his participation "sounded like it was positive and he was interactive." Father had a two-hour visit once a week at the family visitation center, and also saw R.H. briefly before and after school each day. The reports from two of the visits were positive and did not show any indication from the visitation supervisor that R.H. feared Father. The report of two other visits, however, documented the incident in which Father locked himself and the child in the hotel room at Disneyland and where Father separated the child from the caregiver and pinched her during a supervised visit. Despite Father completing parenting education, Chavez remained concerned about R.H.'s safety in Father's care. The child's multiple disclosures that Father hit her further caused Chavez to believe it would be "detrimental" to place R.H. in Father's care.

B.    *Father's Testimony*

Father described his relationship with R.H. as "very close" and said they were "like a twisted pair of wire." During their visits, R.H. often asked him when she would be able to go home and stay with him.

Father denied he struck R.H. in the face on January 13, 2022, and maintained he accidentally hit the child with the door. He explained, "I opened the door, and she's always like two inches away from me, and . . . I think she was trying to race me going up the stairs and she ran by and I opened the door and it hit her in the face pretty good." Father said "the little mark on her cheek matche[d] perfectly with the door on the doorknob." He denied telling the police that night he slapped her in the face. He denied hearing voices in the walls or telling the police that R.H. had been replaced with a lookalike.

Father denied he has ever heard voices in the walls of his home. He explained, "[w]hen the bar[r]e studio below [him] is doing their yoga workout, it's super loud and [he] hear[s] all kinds of stuff, but other than that, no." He denied ever hearing vibrations in a mattress and cutting it open; he laughed when the Agency's attorney asked this question. He also denied he ever believed Mother was "actually two other women."

He asserted his prior diagnosis of paranoid personality disorder was "overthrown." He conceded that "[o]ne doctor" did reach that diagnosis, but he "went and saw a different doctor for a long time, and [that doctor] basically said in court already that [he is] not paranoid personality disorder at all." Father testified he does not believe he needs any mental health treatment. At the time of his testimony, Father had been to one therapy session, although he intended to go weekly.

Father also testified he had started random drug testing three to four weeks before the hearing. He believed he had tested "[f]our or five times" and submitted the first written drug test to the court (which was positive for marijuana and otherwise negative). He testified he had not yet received the "written" results of any other tests.

C.    *Dr. Murphy's Testimony*

Despite refusing a psychological evaluation with an Agency-approved doctor before the contested jurisdiction hearing, Father obtained a psychological evaluation from a private psychologist of his own choosing, Dr. Murphy. Father interviewed with Dr. Murphy, over three FaceTime video conferences, in February and March 2022. Dr. Murphy reviewed the dependency petition, two of the Agency's reports, and the police reports regarding the May 2019 incident and January 2022 incident. He issued a report on April 3, 2022. We summarize Dr. Murphy's report before turning to his testimony.

According to the report, Father told Dr. Murphy he does not have "any mental health history of significance" and that "he has never been diagnosed with a mental [health] disorder." Father denied he struck R.H. in the face. Father told Dr. Murphy that on January 13, 2022 he and R.H. had gone to bed earlier in the evening but he woke up and thought he heard an explosion. He asked a friend to come over for support, the friend brought presents, and it turned into " 'a Christmas night.' " He went to open the front door to let fresh air in due to his asthma, R.H. " 'was right next to [him] and when [he] opened the door it hit her in the face.' " R.H. was screaming and " 'it took her

awhile to calm down.' " Father told Dr. Murphy he did not believe he " 'was 5150' " and that he was " 'delirious from not sleeping.' "

Father told Dr. Murphy that he "always" used marijuana and used it "pretty regular[ly]." He tried cocaine and hallucinogens "years ago," but had not used either "in years" and denied using any other drugs. Dr. Murphy administered a substance abuse screening and found "no indication" in Father's scores of any potential for substance abuse problems. Dr. Murphy concluded Father "has no history of aggressive, violent or predatory behavior," despite the two police reports regarding the May 2019 and January 2022 incidents. He administered two tests to assess Father's potential for "aggressive function" and for "child abuse," and found Father's overall scores did not indicate concerns for either.

Dr. Murphy diagnosed Father with "Brief Psychotic Disorder" and "Adjustment disorder of adulthood with mixed features."[13] He concluded Father was "a generally well[-]adjusted and resourceful 56 year old male" with "no indicators or suggestions of a serious mental disorder." Rather, "[h]e currently appears to be seriously involved in separation from his daughter affecting him as an adjustment disorder."

Dr. Murphy testified Father had "a brief psychotic disorder," based on his review of the Agency's report of the January 13, 2022 incident. He explained such an episode is "not usually viewed as chronic disorders, but they can certainly recur depending on stressors and the various aspects of a person's environment," including "drug use, alcohol use, things like that."

---

[13] Dr. Murphy noted Father presented symptoms "similar to those of a hypnagogic state" which he explained is a psychotic episode brought on by the state "between sleep and wakefulness." He later testified this theory was "only a hypothesis" and he does not know that is what happened.

Dr. Murphy testified methamphetamine and marijuana are psychoactive drugs and "affect the brain in various ways and can cause psychotic functioning." He opined that if a person's psychosis is caused by methamphetamine, the psychosis "goes away" if the substance abuse stops. On cross-examination, the Agency's counsel asked Dr. Murphy, "Would it have been important to know whether the father was under the influence that night of January 13th?" Dr. Murphy responded, "I'm not sure for what reason other than the fact that he had a psychotic episode. It would be pretty concrete to know that he was under the influence of the drug, because that caused the psychotic episode."

Dr. Murphy conceded the tests he administered to evaluate Father's current mental status, including his potential for aggression or violence and child abuse, were all self-reporting and the results were driven by Father's answers. If Father was not honest, the tests would not be accurate. And Dr. Murphy agreed Father "tried to present himself in the best light possible" during their sessions.

D.    *The Parties' Arguments*

The Agency asked the court to find the petition true, asserting the events in January 2022, leading up to Father hitting R.H., were "not an isolated incident" and there was "a pattern of erratic thoughts and behaviors." The Agency also urged the court to find, by clear and convincing evidence, that there was no safe way to keep R.H. in Father's care "at this time." It specifically asked the court to order a psychological evaluation for Father by an Agency-approved doctor, arguing that Father's evaluation by the doctor of his own choosing was not reliable.

Father asked the court to dismiss the petition. Father's counsel conceded "[i]t [wa]s very true that some incident occurred" on January 13,

24

2022 but asserted "the mental health issue of January 13 . . . no longer exists and is not currently a concern." Dr. Murphy had opined that Father appeared "to presently be in good mental health," and the Agency had provided no evidence contrary to Dr. Murphy's opinions.[14] Counsel further argued there was no "hardcore evidence of physical abuse," and that R.H.'s behavior with Father showed she did not fear him. Alternatively, counsel asked the court to return R.H. to Father's care with the services that were already in place.

R.H. joined in the Agency's requests and arguments "in their entirety." R.H.'s attorney requested the court make true findings on both counts of the petition and take jurisdiction over R.H. and, as to disposition, counsel argued the evidence established it would be unsafe for R.H. to return to her Father's care until Father demonstrated he had stabilized his mental health. Counsel asserted the "great weight of the evidence" established both Father's physical abuse and mental illness "are [protective issues] still presenting today." Responding to Father's argument that these issues "do not exist anymore," counsel argued "we don't know that they don't exist, . . . largely because the father has controlled the flow of information" and "has not been up front with his history."

---

14    As noted, the Agency attempted to have Father evaluated by an Agency-appointed psychologist in March 2022 but Father declined to participate. In an addendum report filed April 18, 2022, after reviewing Dr. Murphy's report, the Agency requested the court order Father to undergo a psychological evaluation through an Agency-appointed psychologist. At the contested hearing, Father's counsel objected to that request (as well as the Agency's request he participate in a substance abuse program and the 52-week child abuse class), asserting "there is [no] need for another psychological evaluation."

25

E. *The Juvenile Court's Rulings*

The juvenile court found "there were a number of previous psychotic episodes going back or at least documented as far as back as 2017." Next, the court found Father's testimony about what happened on January 13, 2022 to be *not* credible. Instead, it "found the police officer's report to be a credible report *as to the state of mind* of [Father] and did not find [Father's] denials to be supported by the evidence." (Italics added.) It found "it[ was] clear that something was going on, . . . even Dr. Murphy said there was a brief psychotic episode," and "so there is clearly something there." It also found the facts set forth in the Oregon Judgment of Dismissal to be "a predicate of a pattern."

The court then framed the issue on count 1 as "whether [as] a result of a psychotic break or some unregulated extreme, impulsive reaction to stressors, whatever those stressors were on January 13th, it resulted in an injury that classifies by law as a [section] 300(a) injury." Based on its factual findings, the court ruled "by *clear and convincing evidence* that count 1 of the allegation ha[d] been proven" and sustained the allegations pursuant to section 300, subdivision (a). (Italics added.) Specifically, it found true R.H. "has suffered, or there is a substantial risk that the child will suffer, *serious physical harm* inflicted nonaccidentally" by the parent. (§300, subd. (a), italics added.)

Turning to count 2, the court stated: "[C]learly there is a pattern of mental health episodes, but there isn't to this court sufficient evidence for me to find that [R.H.] is . . . presently at risk as a result of those episodes. They certainly [are] sporadic in nature. Whether they're escalating or not, there isn't sufficient evidence, so count 2 is dismissed." Accordingly, the court found R.H. to come within its jurisdiction only under section 300, subdivision

26

(a), "as to those injuries sustained," and reiterated that it made a *true finding by clear and convincing evidence*" as to count 1. (Italics added.)

Although it dismissed count 2, the court found evidence of Father's mental health "certainly is sufficient to lead the court to believe that that plays into the current risk as it relates to excessive discipline or impulsive behavior that could lead to future harm that requires monitoring by this court." The court stated, "I know he has these psychotic episodes," and rejected that another psychological evaluation would "give the court any additional information."

The court also found that R.H. had made statements she had secrets, and secrets "are indicative of fear," but it found it is "typical that a child who has been struck by a parent, they loathe and love in the same breath." It found R.H. "is fearful" of Father's impulses, stating, "It is unusual for a child to roll up in a ball and put a blanket over and pretend she's a turtle or something. . . . It's just an indication and a red flag that there is something that causes . . . her [to] catch her breath and wonder what [Father is] going to do or say?"

Regarding disposition, the court stated that "[w]hile the court is concerned, the court believes that it would not be detrimental to place [R.H.] back with Father" under the following conditions: (1) Father submit to a psychological evaluation from a provider selected by the Agency; (2) Father continue therapy until his current therapist submits an opinion to the court that Father's "mental health episodes or . . . possible discipline issue[s]" have been addressed; (3) Father submit to drug testing including a hair follicle test and ongoing random testing; and (4) Father make R.H. "available to the

Agency on demand for physical checks of her body for bruising."[15] Explaining its reason for ordering drug testing, the court stated "there is enough indication that the psychotic episodes may be triggered by drug usage."

The court then addressed Father directly and said: "I think that the court is going out on a limb . . . and I don't stay on that limb for any period of time. If the wind blows in the wrong direction, I'm jumping off of that limb and the weight of that will fall on your shoulders." The court told Father that it will monitor "how [R.H.] fares under [his] roof, and anything that causes that wind to shift, [Father] may bear the burden of that, because as we look forward, the best indicator of patterns and behaviors and understanding is by looking backwards."

Upon receiving the court's warning, Father said: "My daughter's a rough and tumble kid. I'll have to take a picture of her every morning. [¶] . . . [¶] She always has bruises." The court responded: "I'm not concerned about a rough and tumble child, *I'm concerned about punching and pinching and psychotic episodes and impulsive behavior and response to external stresses, which I believe have been well-documented.*" (Italics added.) The court again warned Father, "[Y]ou've been in court on more than one occasion on similar circumstances, whether it's Oregon or here. Where there is smoke, there is fire."

---

15 These were not conditions precedent to the Agency returning R.H. to Father's care. R.H. was returned to Father the same day the court ordered her to be returned, that is April 20, 2022. In response to our request for supplemental briefing on R.H.'s petition for writ of supersedeas, the parties indicated Father was scheduled for a psychological evaluation with an Agency-appointed provider on May 26, 2022. We have no information on whether that has taken place or its results.

28

R.H. timely appealed both the juvenile court's jurisdictional order dismissing count 2 and its dispositional order placing her with Father.[16] Both the Agency and Mother join in her appeal.

DISCUSSION

I.

*The Juvenile Court Erred by Dismissing Count 2*

We conclude the juvenile court erred by dismissing count 2 and reverse the jurisdictional order on two independent grounds. First, the court erroneously required proof of the jurisdictional findings by clear and convincing evidence, rather than by a preponderance of the evidence. Second, even if we were to assume the court applied the correct burden when it dismissed count 2, the dismissal was still error because the court's own factual findings compelled it to find jurisdiction over R.H. pursuant to section 300, subdivision (b)(1), as a matter of law.

Section 300 describes the various ways that a child comes within the jurisdiction of the juvenile court. (§ 300.) Relevant here, and as alleged in the petition, section 300, subdivision (b)(1), provides that a child "is within the jurisdiction of the juvenile court" if: "The child has suffered, *or* there is a substantial risk that the child will suffer, serious physical harm or illness, . . . by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness[.]" (Italics added.)

"At the jurisdictional hearing, the court shall first consider only the question whether the minor is a person described by Section 300." (§ 355.)

_____

16    R.H. also filed a writ of supersedeas asking this court to vacate or stay the juvenile court's order and to direct the juvenile court to return R.H. to the care of the Agency. Although we denied the writ, we expedited the timeline for this appeal.

29

The Agency carries the burden of establishing jurisdiction and must do so by a preponderance of the evidence. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 768 (*Drake M.*) ["DCFS . . . had the burden of proving 'jurisdictional facts by a preponderance of the evidence[.]' "]; see *In Re Joaquin C.* (2017) 15 Cal.App.5th 537, 560–561 (*Joaquin C.*); *In re J.K.* (2009) 174 Cal.App.4th 1426, 1432 ["The court's jurisdictional findings must be based on a preponderance of the evidence."]; § 355 ["Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300."].)

Here, the juvenile court twice stated that it was making its jurisdictional findings by clear and convincing evidence.[17] A juvenile court must make findings supporting *removal* of a child from a parent's care by clear and convincing evidence, pursuant to section 361, subdivision (c)(1), but the court's finding that a child falls under the jurisdiction of the juvenile court pursuant to section 300 need only be supported by a preponderance of the evidence. (§ 355; *Joaquin C., supra,* 15 Cal.App.5th at pp. 560–561; *In re J.K., supra,* 174 Cal.App.4th at p. 1432; *Drake M., supra,* 211 Cal.App.4th at p. 768.) Although the court's true finding by clear and convincing evidence is certainly sufficient to support jurisdiction on count 1 (alleging physical abuse), the court was *not required* to find clear and convincing evidence to

---

17     We asked the parties to address the burden of proof in supplemental briefing. We acknowledge, as Father points out, that the court explicitly made its jurisdictional findings as to count 1 by clear and convincing evidence and was silent as to the standard it applied in dismissing count 2. However, it would be illogical to conclude the court applied one standard in sustaining count 1 and another (lower) standard in dismissing count 2. We also note that nowhere in the court's explanation of its ruling did it reference the preponderance of the evidence standard.

support either count 1 or count 2 (alleging inability to protect or care due to mental illness).

Because the juvenile court applied the wrong legal standard in dismissing count 2, we reverse on that ground alone. (See *In re A.M.* (2013) 217 Cal.App.4th 1067, 1069, 1077 [finding reversible error where "the juvenile court applied the wrong legal standard and failed to make necessary findings"]; *In re Henry V.* (2004) 119 Cal.App.4th 522, 530 [finding reversible error where there was no indication the juvenile court "understood the necessity of making the dispositional findings on clear and convincing evidence"].) But even if we were to assume the court applied the correct preponderance of the evidence standard when it dismissed count 2, we conclude the dismissal was still error because the court's own factual findings compelled it to find R.H. came within the court's jurisdiction under section 300, subdivision (b)(1), as a matter of law.

Appellate courts typically review a juvenile court's jurisdictional findings for substantial evidence. (*In re J.K., supra,* 174 Cal.App.4th at p. 1433; *In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992 (*Yolanda L.*); *In re Sheila B.* (1993) 19 Cal.App.4th 187, 199 (*Sheila B.*).) The substantial evidence standard of review is a deferential standard of review. As one court explained, "[i]t is axiomatic that an appellate court defers to the trier of fact on such determinations, and has no power to judge the effect or value of, or to weigh the evidence; to consider the credibility of witnesses; or to resolve conflicts in, or make inferences or deductions from the evidence." (*Sheila B.,* at p. 199.) " 'Issues of fact and credibility are questions for the trial court.' " (*Id*. at p. 200.)

"But this test is typically implicated when a defendant contends that the plaintiff succeeded at trial in spite of insufficient evidence." (*In re I.W.*

(2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)[18]  As the court in *In re I.W.* explained, where, as here, "the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment," because the appellant is attacking the trial court's finding that the appellant did *not* present sufficient evidence to meet that burden.  (*In re I.W.,* at p. 1528.)  In such cases, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law" or, put another way, "whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*Ibid.*; *In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1147; *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962,

---

[18]    In *Conservatorship of O.B., supra,* 9 Cal.5th 989, the California Supreme Court addressed a probate statute that required the trial court to make findings by clear and convincing evidence.  (*Id.* at p. 995.)  In discussing the standard of review on appeal, the Court disapproved of a number of cases in which the courts had "described the clear and convincing standard [imposed by various statutes] as disappearing on appeal" and clarified, "when a heightened standard of proof applied before the trial court, an appropriate adjustment must be made to appellate review for sufficiency of the evidence." (*Id.* at pp. 1010 & fn. 7, 1011.)  As we have discussed, jurisdictional findings under section 300 only require the court to make findings by a preponderance of evidence, but section 361 requires the juvenile court to make findings by clear and convincing evidence before removing a child from a parent's care.

966–967 (*LA DCFS*).)[19]  Still, reviewing the juvenile court's dismissal of count 2 for error as a matter of law "is but another formulation of the substantial evidence standard." (*Sheila B., supra,* 19 Cal.App.4th at p. 199; *LA DCFS*, at p. 967 ["Nevertheless, courts in this situation have still employed the test of whether there is substantial evidence that supports the determination of the trier of fact."].)  But regardless of how the standard of review is formulated, we conclude the juvenile court erred.

The juvenile court found there was insufficient evidence to support the allegations in count 2 that R.H. came within the court's jurisdiction pursuant to section 300, subdivision (b)(1).  Relevant here, section 300, subdivision (b)(1), requires proof by a preponderance of the evidence that:  (1) "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm"; (2) "as a result of"; and (3) the parent's failure or inability to adequately supervise or protect the child or inability to provide regular care for the child "due to the parent's . . . mental illness."  (See *Joaquin C., supra,* 15 Cal.App.5th at pp. 560–561.)  Although the third element has at times been cast in terms of neglect, section 300, subdivision (b)(1), "authorizes dependency jurisdiction without a finding that a parent is at fault or

_____

[19]    The Agency acknowledges that, under this line of cases, where the Agency bears the burden of proof or the child assumes that burden, a determination the burden of proof was not met is often reviewed as a matter of law.  However, it asserts we should review the dismissal of count 2 for an abuse of discretion.  The Agency argues that because the court found jurisdiction under section 300, subdivision (a), and that Father was having a psychotic episode when he physically abused R.H., this situation is "more akin" to a scenario in which the juvenile court amends a petition to conform to proof.  The Agency provides no authority to support its position and, to the contrary, "a juvenile court has no discretion to dismiss a dependency petition if it concludes the moving party has met its evidentiary burden." (*Sheila B., supra,* 19 Cal.App.4th at p. 199.)

33

blameworthy for [his] failure or inability to supervise or protect [his] child."
(*In re R.T.* (2017) 3 Cal.5th 622, 624; *Joaquin C.* at p. 561.)

The Agency specifically alleged that R.H. "has suffered *or* there is a substantial risk" that she will suffer serious physical harm due to Father's mental illness (italics added), based on the following facts:

> "On or about January 12, 2022, the father had a mental illness as evidenced by, but not limited to: the father engaged in delusional and paranoid thinking and struck the child in the face. Thereafter, the father was placed on a hold under Welfare & Institutions Code Section 5150. Further, the father has a history of engaging in paranoid and delusional thinking and becoming violent as was evidenced on May 1, 2019 when the father believed the mother was an impersonator and strangled and kicked the mother in the face while the child was present. The latter renders the father incapable of providing regular care for said child."

Based on the juvenile court's own factual findings, the Agency met its burden of proving jurisdiction under section 300, subdivision (b)(1), by a preponderance of the evidence.

First, the juvenile court found not only that Father suffered a mental illness on January 13, 2022, but that he had "a pattern" of similar psychotic episodes going back "as far . . .back as 2017." Second, the court found Father struck R.H. because of his paranoid and delusional thinking during the psychotic episode on January 13. Third, the court found (by clear and convincing evidence when it sustained count 1) that Father's conduct caused serious physical harm to R.H. Each of those findings was amply supported by substantial evidence.

Father himself concedes he has had at least five psychotic episodes since 2017 and that a doctor has previously diagnosed him with paranoid personality disorder. The Oregon court confirmed that professional diagnosis and noted Father has had at least four prior psychotic episodes dating back to 2017, in which he suffered similar delusions of believing Mother was living in

34

his walls. During the May 2019 incident, Father violently strangled and kicked Mother in the face in front of R.H. because he believed Mother was an "impersonator." And the juvenile court in this case expressly found those prior psychotic episodes to be a "predicate of a [clear] pattern" of a mental illness.

The uncontroverted evidence established Father's mental illness continued to manifest in similar psychotic episodes in January 2022. Over the course of three days leading up to his physical abuse of R.H. in January, Father told Angel multiple times he believed Mother and her boyfriend were living in his walls. He even had Angel sit in the room to listen to the voices he was hearing in the walls. More troubling was that he told Angel he aimed a gun at the wall but restrained himself from shooting, when he was at home alone with a four year old child. It was not the first time that Father had mentioned a weapon during his delusions of Mother living in the walls. In the text messages he sent Mother, he threatened to harm her with a pickaxe, "promis[ing]" Mother "it WILL be a death sentence."

The various accounts of Father's continuing psychotic episodes by numerous witnesses were further corroborated by Father's own expert. Dr. Murphy confirmed Father was suffering from a brief psychotic episode on January 13, 2022. And he testified psychotic episodes of the type Father experienced "can certainly recur" and could be triggered by drug use, alcohol use, or other stressors.

The juvenile court found "the police officer's report to be a credible report as to [Father's] state of mind" during the incident on January 13. The officers, who interacted and observed Father on January 13, concluded they needed to place Father on a 5150 psychiatric hold and take R.H. into temporary protective custody *because* Father's delusions led him to slap R.H.

in the face.  Father told the police R.H. was a " 'look alike.' " He confirmed he struck R.H. in the face because she was being too loud and "he knew it wasn't his daughter."  The report also noted R.H. had an unkempt appearance and was running around the home, which was in a state of disarray, at approximately 3:20 in the morning.

Given this overwhelming evidence, from numerous witnesses and sources, it is not surprising the juvenile court found Father's denials were not truthful.  Instead, the court found Father physically abused R.H. during a psychotic episode, which directly resulted in serious physical harm to R.H. The fact that the police determined it was necessary to place Father on a 5150 hold and take R.H. into protective custody was also substantial evidence Father was incapable of providing regular care for R.H. during the psychotic episode.

Because the juvenile court made factual findings consistent with the statutory definition of section 300, subdivision (b)(1), and those findings were supported by substantial evidence, the court erred as a matter of law in dismissing count 2 of the petition.  (See *In re Christina T.* (1986) 184 Cal.App.3d 630, 640 (*Christina T.*) [concluding the juvenile court erred as a matter of law in dismissing a dependency petition despite making factual findings sufficient to support jurisdiction]; *LA DCFS, supra,* 215 Cal.App.4th at p. 970 [concluding the juvenile court erred by dismissing a section 300 petition where the evidence established the minor was at risk of abuse and "the grounds specified by the juvenile court did not support its decision to dismiss the petition"]; *In re E.A.* (2018) 24 Cal.App.5th 648, 663–664 [juvenile court's dismissal of petition despite making factual findings supporting jurisdiction was clear error requiring reversal].)  In other words, having found the Agency proved the factual allegations in support of jurisdiction

36

under section 300, subdivision (b)(1), the juvenile court did not have discretion to dismiss count 2. (See *Sheila B., supra,* 19 Cal.App.4th at p. 199 ["a juvenile court has no discretion to dismiss a dependency petition if it concludes the moving party has met its evidentiary burden"].)

The juvenile court seems to have based its dismissal of count 2 on a finding that there was not sufficient evidence that R.H. was "presently at risk as a result of those [psychotic] episodes." The court stated, "whether they're escalating or not, there isn't sufficient evidence, so count 2 is dismissed." Not only was this an improper basis for the court to decline jurisdiction, but the court had found R.H. *was* presently at risk because of Father's psychotic episodes. It found there "certainly [was] sufficient evidence to lead the court to believe that [Father's mental health] *plays into the current risk* as it relates to excessive discipline or impulsive behavior *that could lead to future harm* that requires monitoring by this court." (Italics added.) Still, there is *no* requirement in the law that mental illness be "escalating." (See *Christina T., supra,* 184 Cal.App.3d at p. 640 [juvenile court erred by believing it had to make an additional finding not supported by law].)

The juvenile court's finding that Father had *already* caused serious physical harm to R.H. as a result of a "pattern of mental health episodes" was sufficient to establish jurisdiction. (See *In re J.K., supra,* 174 Cal.App.4th at p. 1434 ["The language of section 300, subdivisions (a), (b) and (d) is clear. All three subdivisions are satisfied by a showing that the minor *has suffered prior* serious physical harm or abuse."].) As the court in *In re J.K.* explained, "the use of the disjunctive 'or' [in section 300, subdivision (b)(1)] demonstrates that a showing of prior abuse and harm is sufficient, standing alone, to establish dependency jurisdiction." (*Id.* at p. 1435, fn. omitted.) A showing that there is a substantial risk the child will suffer a future harm is

relevant as an *alternative* basis for jurisdiction und section 300, subdivision (b)(1). (*Ibid.*) It is also relevant to determine whether removal is warranted under section 361. (*Ibid.*) But such a showing is not necessary to establish jurisdiction where the conduct at issue has already resulted in serious physical harm. (*Ibid.*) But whether Father's episodes were "sporadic" or "escalating," the juvenile court had already concluded that R.H. had suffered a serious physical harm as a result. Having done so, it was compelled to find R.H. came within its jurisdiction under section 300, subdivision (b)(1).

It is true, as courts have noted, that jurisdiction cannot be based on a single episode of endangering conduct where there is *no evidence* the conduct will reoccur. (See, *In re J.N.* (2010) 181 Cal.App.4th 1010, 1022–1027 [disagreeing with *In re J.K.* "to the extent it concludes that section 300, subdivision (b), authorizes dependency jurisdiction based upon a single incident resulting in physical harm absent current risk"]; *Yolanda L., supra,* 7 Cal.App.5th at p. 993 [relying on *In re J.N.*].) Those cases do not preclude jurisdiction here. Father's psychotic episodes in January 2022 were not an isolated incident.

The court in *In re J.N.* found a single occurrence of a parent driving while intoxicated with the children in the car was not sufficient to establish jurisdiction because there was no evidence the conduct would recur. (*In re J.N., supra*, 181 Cal.App.4th at p. 1026.) The parents were remorseful, and neither consumed alcohol regularly nor had a substance abuse problem. (*Ibid.*; but see *In re M.R.* (2017) 8 Cal.App.5th 101, 107 [distinguishing *In re J.N.* where parents continued to minimize the seriousness of the incident].) By contrast, here, the juvenile court expressly found Father had a "*pattern* of mental health episodes," the most recent of which resulted in serious harm to

R.H. (Italics added.) Dr. Murphy testified those episodes "can certainly recur" and the cause had not yet been identified.

Any deficiency in the evidence regarding the degree of that ongoing risk was the direct result of Father's own obfuscation. (See *In re J.M.* (2019) 40 Cal.App.5th 913, 921–923 ["a court errs when it dismisses a petition for lack of sufficient evidence of *current* risk when the reason why such evidence is lacking is because a parent [evaded the agency]"].) Father refused to release his medical records from the hospital following the 5150 psychiatric hold, which might have shed more light on Father's mental state that evening. They may have revealed whether Father had used methamphetamines, or some other controlled substances, at the relevant time, which would provide some understanding as to the potential cause of the psychotic episodes. Father obscured the critical issue further by refusing to take a hair follicle drug test until the juvenile court ordered him to do so at the contested hearing on April 20, more than 3 months after the January 13 incident. Father also refused to provide the Agency with information for a potential key witness ("Laura") and refused to participate in an independent psychological evaluation, choosing instead to provide a report from his own paid expert.

Father now asserts, on appeal, that the Agency did not present evidence *in the form of a psychological expert* that his psychotic episodes were likely to reoccur. But as the court in *In re J.M.* explained, even where the Agency alleges jurisdiction based solely on a substantial risk of future harm, a parent cannot use the requirement that the Agency show a current risk of harm at the time of the jurisdictional hearing "as a sword, rather than a shield." (*In re J.M., supra,* 40 Cal.App.5th at p. 921.) The requirement does "not apply to frustrate dependency jurisdiction" where any lack of evidence is

due to the parent's own obfuscation. (*Id*. at p. 923.) Allowing a parent to evade jurisdiction in this manner would only encourage parents to routinely frustrate the Agency's efforts to monitor the situation, and importantly, the child's safety. (*Id*. at pp. 921–923.) As counsel for R.H. argued below, Father "has controlled the flow of information. He has not been up front with his history." Because Father prevented the Agency and the juvenile court from identifying the cause of his psychotic episodes, there was no basis for the court to conclude the conduct will not reoccur.

Father asserts the existence of mental health issues is not sufficient, on its own, to support jurisdiction. But this is not a case, like those that Father relies upon, where there was no prior harm and no specifically identified risk of future harm as a result of the parent's mental illness. (See *Joaquin C., supra,* 15 Cal.App.5th at p. 564 [admission of mental illness and agreement to seek treatment was not sufficient, without more, to establish jurisdiction]; *In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1319 [Mother's delusion that child's penis was mutilated was not sufficient to establish jurisdiction where there was no evidence the child had suffered or was at substantial risk of suffering serious harm as a result].) Jurisdiction *is* established where the mental illness has already caused serious physical harm, or where the evidence establishes a specific and substantial risk the child will suffer serious harm in the future. (See *In re Travis C.* (2017) 13 Cal.App.5th 1219, 1226 [jurisdiction established where "Mother's illness and her failure to consistently treat it have already put [the children] into situations where they were at a substantial risk of serious physical harm"]; *In re A.F.* (2016) 3 Cal.App.5th 283, 290 [evidence father was unable to care for the minor during randomly occurring " ' "drunk sleep mode" ' " episodes caused by his poorly managed mental illness was sufficient to support jurisdiction].) Here,

the juvenile court made express findings that Father had a pattern of mental health episodes and that his conduct during one such episode resulted in serious physical harm to R.H.

For the reasons stated, we reverse the juvenile court's jurisdictional order and remand with instructions for the court to reinstate count 2.

## II.

*The Juvenile Court Should Consider Whether Its Placement Order Remains Adequate to Protect R.H. in Light of Its Erroneous Dismissal of Count 2*

R.H., joined by the Agency and Mother, asserts the measures the juvenile court put in place are not adequate to protect R.H., and it should have instead found removal was necessary under section 361, subdivision (c).

Section 361 imposes restraints on the juvenile court's authority to remove a child from a parent's physical custody. It provides that "[a] dependent child shall not be taken from the physical custody of his or her parents . . . unless the juvenile court finds clear and convincing evidence" that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, *and there are no reasonable means by which the minor's physical health can be protected* without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1), italics added; see *In re M.V.* (2022) 78 Cal.App.5th 944, 958; *In re A.E.* (2014) 228 Cal.App.4th 820, 826; *In re A.F., supra,* 3 Cal.App.5th at p. 292.)

"Only in a 'narrow subset of cases—those [under section 300, subdivision (e)] where a young child has been severely physically abused and the parent was either the perpetrator of the abuse or unreasonably failed to protect the child from the abuse'—is there a 'rebuttable presumption that

41

removal is necessary.' " (*In re M.V.*, *supra*, 78 Cal.App.5th at p. 959, quoting *In re E.E.* (2020) 49 Cal.App.5th 195, 218; see § 300, subd. (e).) In all other cases, such as this one, " 'the general rule applies and the juvenile court must find clear and convincing evidence to justify removal. (§ 361, subd. (c).)' " (*In re M.V.*, at p. 959, quoting *In re E.E.*, at p. 218.) " ' "The elevated burden of proof for removal from the home . . . reflects the Legislature's recognition of the rights of parents to the care, custody and management of their children, and further reflects an effort to keep children in their homes *where it is safe to do so.*" ' " (*In re M.V.*, at p. 959, italics added.)[20] " ' "By requiring clear and convincing evidence of the risk of substantial harm to the child if returned home and the lack of reasonable means short of removal to protect the child's safety, section 361, subdivision (c) demonstrates the 'bias of the controlling statute is on family preservation, *not* removal.' " ' " (*Ibid.*; see also *In re Kristen H.* (1996) 46 Cal.App.4th 1635, 1656 ["The heavier burden of proof at the dispositional stage of dependency proceedings is intended to protect the fundamental right of a parent to retain custody of a child."].)

Here, the Agency had the burden of proving, by clear and convincing evidence, that there would be a substantial danger to R.H. if she were

---

[20] Although the general principles discussed in *In re M.V.* apply here to the court's removal decision, Father's heavy reliance on the case overlooks several significant points. The uncontroverted evidence in *In re M.V.* established there was *no* safety risk to placing the children with their father, and the only evidence of potential harm from the mother derived from domestic violence between the parents. (*In re M.V.*, *supra*, 78 Cal.App.5th at pp. 961–963.) We concluded the juvenile court erred in its order removing the children from the parents because it failed to comply with section 361, subdivision (c)(1)(A), which required the court to remove mother as the offending parent before removing the children from their home. (*Id.* at pp. 963–965.) This case is not *In re M.V.*

returned to Father's care *and there were no reasonable means to protect her absent removal.*  (See § 361, subd. (c)(1); see *In re M.V., supra,* 78 Cal.App.5th at p. 958.)  The juvenile court concluded the Agency had not met that burden and that there were reasonable means—the four conditions it put in place— to protect R.H. without removing her from Father's care.

To find error under the governing standard of review and the statutory presumption against removal, we must conclude there was *no* substantial evidence to support the juvenile court's finding the Agency had not met its burden.  (See *In re I.W., supra,* 180 Cal.App.4th at p. 1528; *Sheila B., supra,* 19 Cal.App.4th at p. 199.)  We are required to "view the record in the light most favorable to the prevailing party and give due deference to how the [juvenile court] may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence."  (*In re M.V., supra,* 78 Cal.App.5th at p. 960.)  We are not permitted to reweigh the evidence or make our own credibility findings, and may not disturb the juvenile court's finding so long as "it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the [juvenile] court might have reached a different result had it believed other evidence."  (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228 (*Dakota H.*).)  Although a different court may very well have made a different ruling on the placement of R.H. based on the same evidence, we cannot say there was *no* substantial evidence to support the order this juvenile court did make.  (See *In re I.W.,* at p. 1528; *In re M.V.,* at p. 959.)

The juvenile court did explicitly consider the risks presented by Father's mental illness when making its dispositional findings under section 361, subdivision (c), even though it (erroneously) declined to take jurisdiction under section 300, subdivision (b)(1).  The court stated Father's mental

health did "play[ ] into the current risk as it relates to excessive discipline or impulsive behavior that could lead to future harm that requires monitoring by this court." The court explained that it had "gone back and forth as to the appropriate response" to that risk, and although it was concerned, it determined it would not be "detrimental" to return R.H. to Father's care under specific conditions. Those included: (1) Father submit to a psychological evaluation from a provider selected by the Agency; (2) Father continue therapy until his current therapist submits an opinion to the court that Father's "mental health episodes or . . . possible discipline issue[s]" have been addressed; (3) Father submit to drug testing including a hair follicle test and ongoing random testing; and (4) Father make R.H. "available to the Agency on demand for physical checks of her body for bruising."

The measures the juvenile court put in place were aimed at protecting R.H. against the risks associated with Father's mental illness, including any psychotic episodes induced by substance abuse. However, it is unclear what impact, if any, the court's erroneous dismissal of count 2 may have had on the court's placement decision. As noted, the court did acknowledge the risk of Father's psychotic episodes, at least to some degree, and did put conditions in place to mitigate those risks. But just before finding it would not be "detrimental" to return R.H. to Father's care, the court analogized this case to one in which a child was returned to the mother "on a family maintenance with severe injuries inflicted by a belt or something . . . where the mother admitted those injuries." The facts the court recited are similar to *In re A.E., supra,* 228 Cal.App.4th 820 and *In re Jasmine G.* (2000) 82 Cal.App.4th 282. Neither of those cases involved a substantial risk of harm due to a parent's mental illness. Instead, each involved isolated instances of excessive corporal punishment and the courts in each found removal was not necessary because

44

the parents had expressed remorse and assured the court they would no longer use physical means of punishment.  (See *In re A.E.* at pp. 823-824, 826-827; *Jasmine G.,* at p. 288.)  These cases are not instructive here.

It is apparent the juvenile court struggled with its decision.  The court admittedly stated it was "going out on a limb" with its placement order, but that it would jump off that limb if anything caused the wind to shift in the wrong direction.  On remand, the juvenile court should consider whether, in light of our opinion and reinstatement of count 2, its original placement order *remains* adequate to protect R.H. given *all of the protective issues* that compel dependency jurisdiction in this case.  (See § 385 ["Any order made by the court in the case of any person subject to its jurisdiction may at any time be changed, modified, or set aside, as the judge deems meet and proper[.]"].)  And as in all juvenile dependency cases, time has not stood still during the pendency of this appeal.  R.H. has now been in Father's care for approximately three months under the supervision of the juvenile court.  On remand, the court must make its decision based on the facts existing at the time of the further proceedings.  It should determine if Father has been complying with its previous orders, and whether additional conditions are necessary to protect R.H.

## DISPOSITION

The juvenile court's jurisdictional order is reversed.  The matter is remanded to the juvenile court with instructions for the juvenile court to reinstate count 2 and to enter a new order finding jurisdiction pursuant to section 300, subdivision (a) *and* subdivision (b)(1).  The dispositional order is affirmed.  In light of our reinstatement of count 2 and any additional information obtained during the pendency of this appeal, the juvenile court

should also consider whether its dispositional order remains adequate to protect R.H. and whether additional protective measures are necessary.


DO, J.

WE CONCUR:


HALLER, Acting P. J.


IRION, J.